550 S.E.2d 355

STATE of West Virginia ex rel. The LEAGUE OF WOMEN VOTERS OF WEST VIRGINIA; American Civil Liberties Union of West Virginia; West Virginia Citizen Action Group; West Virginia Education Association; Common Cause of West Virginia; and Delegate Arley R. Johnson, A Member of the West Virginia House of Delegates, Petitioners,

v.

Earl Ray TOMBLIN, President of the West Virginia Senate; and Robert S. Kiss, Speaker of the West Virginia House of Delegates, and the Office of Governor of the State of West Virginia, Respondents.

No. 27905.

Supreme Court of Appeals of West Virginia.

Re–Submitted Feb. 7, 2001.

Decided March 26, 2001.

567

Margaret L. Workman, Esq., Kathy A. Brown, Law Student, Margaret Workman Law, L.C., Charleston, for the Petitioners.

M.E. "Mike" Mowery, Esq., Mark W. McOwen, Esq., Marsha K. Morris, Esq., West Virginia House of Delegates, Charleston, for the Respondent, Speaker of the West Virginia House of Delegates, Robert S. Kiss.

Jennifer Bailey Walker, Esq., West Virginia Senate, Michael R. Crane, Esq., Forman & Crane, Charleston, for the Respondent, President of the West Virginia Senate, Earl Ray Tomblin.

Benjamin L. Bailey, Esq., Brian A. Glasser, Esq., Thomas F. Basile, Esq., Bailey & Glasser LLP, John F. McCuskey, Esq., Shuman, McCuskey & Slicer, PLLC, Charleston, for the Respondent, Office of the Governor.

ALBRIGHT, Justice:

This matter comes to us upon a petition for a writ of mandamus [1] filed on behalf of several prominent public interest groups [2] and a former member of the Legislature [3] against the presiding officers of the House of Delegates and state Senate and "the office of the Governor" [4] (hereinafter collectively referred to as "Petitioners"). Petitioners argue that the practices currently employed by the Legislature in preparing the "budget digest" mandated by West Virginia Code § 4-1-18 (1969) (Repl.Vol.1999) are in violation of the Modern Budget Amendment,[5] the constitutional provision regarding separation of powers,[6] and this Court's directives in *Common Cause v. Tomblin*, 186 W.Va. 537, 413 S.E.2d 358 (1991). Petitioners assert additionally that the Legislature is unlawfully accomplishing the transfer to the governor's civil contin-

gent fund [7] of appropriations initially made to the House of Delegates. As relief from these asserted violations, Petitioners seek a writ of mandamus finding these practices unconstitutional; directing the Legislature to forthwith cease and desist from designating funds in violation of both constitutional and statutory mandates; and directing the Legislature to restore all deletions of lawfully appropriated funds.[8] Upon our careful review of the arguments [9] raised against the record submitted, we grant a writ of mandamus as moulded.

## I. Standard of Review

■ Our standard of review for issuing writs of mandamus is well-established:

"A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syl. pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969).

Syl. Pt. 10, *State ex rel. Marockie v. Wagoner*, 191 W.Va. 458, 446 S.E.2d 680 (1994).

## II. Discussion

### A. The Budget Process

■ By law, the state's annual budget must be accomplished pursuant to the provisions found in section 51, article VI of the constitution, known as "The Modern Budget

---

1. This Court has original jurisdiction over this matter pursuant to article VIII, section 3 of the West Virginia Constitution. *See also* W.Va.Code § 53-1-2 to -8 (1933) (Repl.Vol.2000).

2. Those groups include the League of Women Voters of West Virginia, the ACLU of West Virginia, the West Virginia Citizen Action Group, the WVEA, and Common Cause of West Virginia.

3. Arley R. Johnson resigned from his legislative office as a delegate from Cabell County and is now the Executive Director of the West Virginia Workforce Development and Investment Board.

4. The governor's office involved in this cause of action is that of former Governor Cecil H. Underwood. Governor Bob Wise has declined this Court's invitation to appear in this matter.

5. W.Va. Const. art. VI, § 51.

6. W.Va. Const. art. V, § 1.

7. *See* W.Va.Code § 5-1-18 (1923) (Repl.Vol. 1999).

8. Petitioners also seek an award of costs and attorney's fees in connection with this action.

9. Through orders entered on December 8 and 12, 2000, this Court requested additional briefing on the issue of "the constitutionality and mechanics of the appropriation and transfer of funds into and out of the account referred to by the Petitioners as the '098 account.'" We further "ordered that the Office of the Governor be ... made a party respondent in this action with leave to brief and argue."

Amendment." Since its ratification on November 5, 1968, the Modern Budget Amendment has required adherence to a budget process that begins with the governor's delivery, to the presiding officer of each house, of (1) the budget and (2) a bill enumerating the proposed appropriations of the budget [the "budget bill"], clearly itemized and classified, in such form and detail as the governor shall determine or as may be prescribed by law. Section 51 further prescribes that the "budget" shall contain a complete plan of proposed expenditures and estimated revenues, an itemized estimate of the appropriations, in such form and detail as the governor shall determine, or as is prescribed by law, and requires that the budget be accompanied with certain other information relative to the financial condition of the state. Under section 51, no money may be appropriated from the state treasury except by means of a "budget bill" or by a "supplementary appropriation bill." W.Va. const. art. VI, § 51. The Modern Budget Amendment expressly provides that no money shall be expended from the treasury "except in accordance with [the] provisions of this section." *Id.*

As a part of initial legislation implementing the Modern Budget Amendment,[10] the Legislature amended and reenacted West Virginia Code § 4–1–18,[11] which provides as follows:

> The Legislature, acting by its appropriate committees, shall consider the budget bill, the budget document and matters relating thereto, *and following such consideration and upon the passage of the budget bill by the Legislature, the Legislature shall prepare a digest or summary of the budget bill containing detailed information similar to that included in the budget document submitted to the Legislature by the governor but including amendments of legislative committees, and as finally enacted by the Legislature. Such digest or summary shall be prepared at the direction of and approved by members of the conferees committee on the budget* and shall be included in the journals of the Legislature or printed as a separate document, and copies shall be furnished to the

governor, commissioner of finance and administration [abolished], and the various state spending units for such use as may be deemed proper.

W.Va.Code § 4–1–18 (emphasis supplied).

While we outlined in *Common Cause* the process by which the governor's initial submission of the budget bill and budget document to the Legislature progresses to the passage of the budget bill, we find it necessary to expand on that previous discussion. 186 W.Va. at 540–41, 413 S.E.2d at 361–62. Typically, the governor proposes, and the Legislature agrees, to appropriate money in the budget bill to a particular office, officer, or agency under relatively broad categories or "line items," such as "personal services," "unclassified," "administration," and other somewhat more specific, but still generalized, descriptions. As referenced in the statute requiring preparation of a budget digest, West Virginia Code § 4–1–18, as well as the rules of each of the two houses of the Legislature,[12] the budget bill is referred to the appropriate committee in each house, typically the finance committee.

As with any proposed legislation, the detailed examination of such proposal is ordinarily done in committee with the aid of a committee's staff. In the case of the "budget bill," this detailed examination proceeds from the information included in the "budget document" and the legislative hearings held in connection with each respective account set forth in the budget. With laborious and careful detail, the legislative finance committees examine the requests for the next year's appropriations. Each office, officer, and agency justifies to the legislature its respective requests. Similarly, the governor justifies his recommendations as to each of the hundreds of appropriation line items set forth in the "budget bill." The excruciating detail with which the state's annual spending plan is presented in the "budget document" and examined by the relevant legislative

---

**10.** 1969 W.Va. Acts ch. 13.

**11.** This provision was first enacted in 1963.

**12.** Senate Rule 18; House Rule 95.

committees and their staffs [13] and the hours upon hours devoted to this task by legislators and interested citizens is not at all apparent from simply reading through the "budget bill."

As a result of this finance committee review, each respective house may make amendments to the budget bill and may develop recommendations or provisions that will later be found in the budget digest.[14] At the end of the committee consideration of the budget bill and the budget document, it is the "budget bill," not the "budget document," that comes back to the entire Senate or the entire House of Delegates for consideration, with whatever changes the respective house's finance committee has made. The "budget bill," is the document upon which the Legislature, as a whole, votes.[15] After each house of the Legislature has passed its version of the "budget bill," the bill goes to conference, to the *conferees committee on the budget*" to resolve differences between the two versions prepared by each legislative house and also to make such other changes in the "budget bill," as may be necessary in light of other actions taken by the Executive or Legislature subsequent to the passage of the "budget bill" by one house.[16] Only when the *conferees committee on the budget* has finally settled on a single bill that has been voted upon in identical form by both houses of the Legislature is the budget bill ready for presentation to the governor.[17]

From the above discussion, it is clear that three budgetary documents are central to the case before us: (1) the budget bill, (2) the budget, which is sometimes called "the bud-get document;" and (3) the budget digest. From the record submitted in this case, we note the following.

(1) The budget bill in its original form as submitted by the governor in January 1999, for fiscal year 1999–2000, consisted of about 122 double-spaced pages, 8½ by 11 inches.

(2) The budget for fiscal year 1999–2000, as submitted by the governor, with its supplemental information, collectively called the "budget document," consisted of three volumes; two of which were approximately 8½ by 11 inches, and one of which was 11 by 17 inches. Whereas the first and second volumes were 340 and 678 pages long, respectively, the third volume contained over 490 pages, mostly in small type, and delineated information setting forth prior years' expenditures, the current year's appropriations, and the next fiscal year's requests.

(3) The "budget digest" subsequently issued by the legislative budget conferees for fiscal year 1999–2000 consisted of approximately 285 pages, 8½ by 11 inches, generally, but not always, double-spaced. The digest sets forth exact copies of certain line item appropriations—as contained in the budget bill—organized in the order those appropriations appeared in the budget bill. Beneath the excerpt from the budget bill for a particular office, officer, agency, or program, statements are set forth under the heading "Legislative Intent" regarding one or more specific uses for which the conferees committee asserts

---

**13.** Those individuals whose specific task it is to oversee the review of the budget include the respective finance chairs of the two houses, their respective sub-committee chairs, and the professional staffs of the committees.

**14.** In *Common Cause,* we discussed the need to memorialize these negotiations that transpire during the respective consideration of the budget bill by each house of the Legislature. *See* 186 W.Va. at 542, 413 S.E.2d at 363 and syl. pt. 5. We also emphasized that these negotiations do not become finalized until the conferees committee meets as a whole to vote on the budget digest. *Id.* at 543, 413 S.E.2d at 364.

**15.** Whatever effort individual legislators may have made to master the "budget document," the

bill adopted by the Legislature and considered by the governor contains only a small fraction of the information contained in the budget document. In a sense, the "budget bill" simply paints with broader brushes the complete picture conveyed by the "budget document."

**16.** *See* Rule 3, Joint Rules of Senate and House of Delegates.

**17.** Since consideration of the budget bill after a governor's veto of all or part of it is not directly in issue here discussion of legislative reconsideration of the budget bill notwithstanding the objections of the governor is omitted.

that all, or a part of a line item, contained in the budget bill was intended.

## B. Constitutional Concerns

As explained in section A, the preparation of a budget digest is governed by the provisions of West Virginia Code § 4-1-18. While Petitioners agree that the issue of this statute's constitutionality was fully resolved in *Common Cause*, they maintain that the Legislature is applying the statute in an unconstitutional manner. 186 W.Va. at 538, 413 S.E.2d at 359, syl. pt.1. Petitioners' argument is premised, to a large degree, on their assertion that an item set forth in the Budget Digest *that is not also set out with identical specificity in the budget bill* necessarily constitutes an "appropriation."

Petitioners reason that, because an "appropriation" may only be made by a budget bill or supplementary appropriation bill adopted by the whole Legislature and presented to the governor for consideration,[18] items that are set forth in the budget digest which are not correspondingly detailed in the budget bill constitute an unlawful attempt to draw money from the state's treasury. Under Petitioners' reasoning, the powers of the Legislature, as a whole, and the powers of the executive branch are being usurped through the use of the budget digest. We do not agree.

Underlying Petitioners' argument is the implication that the budget process requires a budget bill which sets forth with precise detail each expenditure included in the state's budget. In *Common Cause*, we addressed why the intrinsic need for flexibility renders completely unworkable a detailed line item budget bill.[19] *Id.* at 541-42, 413

S.E.2d at 362-63. Due to the "nearly impossible task of allocating severely limited money among competing ends" the amounts requested by the various departments and agencies through the budget document are often not the same amounts as those finally allocated through the enacted budget bill. *Id.* at 540, 413 S.E.2d at 361. Moreover, as we discussed in *Common Cause*, the expenditures requested by individual departments or agencies at the time the budget document is first prepared can become moot or may be reprioritized due to unanticipated needs that only surface after the budget requests for the next year are first prepared. *See id.* at 541-42, 413 S.E.2d at 362-63. This is where the budget digest serves an important purpose in the whole budgetary process.

Petitioners take issue with certain entries in the budget digest that appear under headings entitled "LEGISLATIVE INTENT."[20] Those entries usually set forth a particular use for part of a line item included in the budget bill, under a more generalized description of funding such as "personal services," or, on occasion, "unclassified." Through the use of these statements of "Legislative Intent," the conferees committee expresses its judgment of why—and for what more specific uses—some or all of the funds appropriated in certain line items in the "budget bill" were included in that line item. *See Hechler v. McCuskey,* 179 W.Va. 129, 133, 365 S.E.2d 793, 797 (1987) (stating that "[t]he Legislature uses this [Budget] Digest as its detailed explanation concerning the manner in which appropriations are to be expended"). In addition to providing necessary detail as to generalized funding appropriations, the budget digest serves an important function when an agency receives less

---

18. See W.Va. Const. art. VI, § 51.

19. As we explained in *Common Cause,* inevitable changes in needs for funding between the time when the budget document is first presented and when the budget bill is ultimately passed renders completely impossible the use of a "carved in stone" line item type of budget bill. We opined in *Common Cause* that the use of such an approach "would perpetrate an evil even greater than the evil petitioners seek to redress." 186 W.Va. at 542, 413 S.E.2d at 363.

20. We note that the use of the term "Legislative Intent" in the budget digest to describe the composite intentions of the committees considering

the budget bill may contribute to the concern of those who dislike the idea of a "budget digest." We compare the inclusion by the conferees committee of "Legislative Intent" language in the budget digest to the actions of congressional committees, who often print lengthy reports on the "intent" of legislation. These congressional reports are often relied upon by courts to ascertain "congressional intent," despite the fact that neither house of Congress has voted on the content of the committee reports. We strongly suggest that future budget digests omit the term "Legislative Intent" and substitute a term which reflects that the recommendations are those of the budget conferees.

funds than it originally requested. In this instance, the budget digest serves as an aid to determine how the limited funding can be divided to meet the agency's needs. In either situation, the budget digest enables the various governmental units to ascertain what uses the Legislature, through its conferees committee, intended for moneys earmarked for a particular department or agency.[21] From our review of the budget digest submitted in this case, it is clear that these statements of "Legislative Intent" only recommend proper, more particular, uses of monies duly appropriated within and under more broadly-stated categories set forth as line-items in the "budget bill."

Another violation of the Modern Budget Amendment arises, according to Petitioners, based on the fact that the expenditure recommendations or specifications in the budget digest appear to be outside the constitutional requirement that all appropriations from the state treasury must be made in the form of either a budget bill or a supplementary appropriation bill. W.Va. Const. art. VI, § 51(1). In Petitioners' view, any expenditures consistent with the statements of legislative intent in the budget digest amount to an appropriation. This argument suggests a misapprehension regarding the nature of the funds that are the subject of the budget digest. Those funds have been lawfully appropriated through the means established by the Modern Budget Amendment. The inclusion of an item in the budget digest in reference to a more generalized line item found in the budget bill simply does not operate to appropriate money from the state treasury within the meaning of article VI, section 51 of the Constitution of West Virginia. All funds that are described in the budget digest reference a specific line item in the budget bill, and it is the passage of that budget bill which constitutes and effects an appropriation under the mechanisms set forth in the Modern Budget Amendment. W.Va. Const. art. VI, § 51(1).

■ Petitioners further suggest that the budget digest process usurps the powers of the Legislature as a whole and the power of the Governor. In considering this contention, we note that, subject only to the broad prescriptions contained in the Modern Budget Amendment and any specific requirements enacted into law, the governor may submit the budget document and the budget bill with as much simplicity or complexity as he deems appropriate. Likewise, the Legis-

---

**21.** As an example, the "Legislative Intent" set forth for the University of West Virginia Health Sciences Account, Fund 0323, organization 0478, is as follows:

It is the intent of the Legislature that from the Capital Outlay and Equipment line-item above, one million dollars be allocated to the Marshall University School of Medicine and one million be allocated to the West Virginia University School of Health Sciences–Charleston Division.

It is the intent of the Legislature that from the line item for the School of Osteopathic Medicine, an amount up to $260,000 shall be expended to provide assistance to those primary health training sites in West Virginia which provide doctor of osteopathy student training to the West Virginia School of Osteopathic Medicine.

It is the intent of the Legislature that from the Correctional Telemedicine Project line-item above, funds be divided among West Virginia University School of Medicine, West Virginia University School of Medicine—Charleston Division, and the Marshall University School of Medicine in order to develop a partnership between these three institutions and the West Virginia State Prison System, the West Virginia Regional Jail System, and the West Virginia Juvenile Detention System in order to develop a pilot project with the purpose of providing health care for inmates through telemedicine technology. Members of this partnership from the University System of West Virginia institutions and the three correctional agencies shall meet regularly to share progress reports. The Vice–Chancellor of Health Sciences, et. al., shall report to Legislature on the current status of this project in December 1999.

The initial distribution of funds for the necessary equipment to begin this project shall reflect the following:

*West Virginia University School of Medicine* shall provide broadcasting and consulting capabilities at the maximum security prison at Mt. Olive in Fayette County.

*West Virginia University School of Medicine—Charleston* will install appropriate tele-health technology at a consulting site at Davis Correctional Facility, a juvenile detention facility in Tucker County.

*Marshall University School of Medicine* will provide technology to connect with the telecommunications system which is already in place in the Regional Jail System.

lature may, through its amendments to the budget bill, insert as much detail as it deems appropriate, subject only to the power of the Executive to remove some of the detail by veto[22] and the prohibition against including subjects of general legislation in the budget.[23]

As to possible intrusion upon the power of the Legislature, as a whole, it should be noted that a simple majority of each house of the Legislature possesses inherent and plenary power to prescribe by rule any procedure it deems appropriate for the consideration of the budget or budget bill in its respective house,[24] and, by agreement with the other house, prescribe such rules for the resolution of differences in legislation between the houses as it deems appropriate. The Legislature may, by duly enacted law,[25] further require such detail in the budget bill or budget document as it deems appropriate. In addition, during the consideration of the budget in conference each house may, by majority vote, instruct the budget conferees appointed by it to take, or refuse to take, such action as a majority of such house shall direct. Finally, each house may, by a vote of half its members, refuse to adopt any proposed budget bill without further and fuller explanation and debate such as fully satisfies at least a majority of those elected to each house.[26]

Careful reflection on the realities of the budget-making process and its acceptance by both houses and by the Executive for nearly a third of a century, lead us to believe that the instruments of government most directly involved in the process have found what they deem to be a suitable balance between the detail needed to support and justify appropriations and the desired flexibility to allow the government to function within more broadly-stated line item appropriations. Assuming that the respective branches follow these procedures faithfully as they have been de-veloped in law and in practice, we can find no basis to treat their considered judgments as outside the constitutional pale.

With reference to this Court's decision in *Common Cause*, Petitioners argue that the budget digest has, in reality, acquired the force of law. 186 W.Va. at 540, 413 S.E.2d at 361. Petitioners suggest that the budget digest process should be viewed as unlawful based on the fact that agencies are required to spend their allotted funds consistent with the recommendations contained in the budget digest. In *Common Cause*, we addressed this same argument in acknowledging that "executive branch employees [may] feel peculiarly bound to follow its [budget digest] dictates." *Id.* at 542, 413 S.E.2d at 363. Rather than determining that this perceived obligation to follow the suggestions set forth in the budget digest elevated the digest to "having the force and effect of law," however, we emphasized the need to follow the dictates of the budget digest statute and its specific requirement that the digest "must be approved by majority vote of a quorum of all the budget conferees pursuant to a meeting regularly called after the passage of the budget bill." *Id.*

■■■ The budget digest, of its own accord, cannot require the expenditure of funds in the manner suggested therein. The agencies are free to disregard the digest statements of legislative intent regarding their earmarked funds, with the understandable caveat that they will have to later explain to the Legislature and the public why they chose to disregard the purpose(s) for which the conferees committee stated such funds were to be utilized. As we exhorted in *Common Cause*, "the agency heads are not bound in law to follow the dictates of the Budget Digest." 186 W.Va. at 541, 413 S.E.2d at 362. In response to Petitioners' suggestion that the officers, offices, and agencies may feel constrained to adhere to the funding

22. W.Va. Const. art. VI, § 51(11).

23. *See* Syl. Pt. 13, *Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1988) (holding that "the Legislature cannot amend general substantive statutes with budgetary language").

24. W. Va. Const. art. VI, § 24.

25. W.Va. Const. art. VI, § 51.

26. *See* W.Va. Const. art. VI, § 51(11) (requiring passage by majority of members elected to each legislative house for budget bills or supplemental appropriation bills).

suggestions contained in the budget digest, we conclude that this is a matter with which the executive branch, not this Court, must deal. Questions involving perceived conflict between the legislative and executive branches are, by and large, political questions, which do not present issues with which this Court can, or should, concern itself. If the persons in charge of the executive branch, its officers, offices, and agencies, choose to adopt the funding recommendations stated in the budget digest, we must assume, in the absence of evidence to the contrary, that the responsible executives, in their settled judgment and discretion, have determined that such spending is in the best interests of the state. If, however, these same entities choose to spend the money for alternate uses within the broad scope of the overall purpose for which the funds were appropriated, there is no legal impediment to that decision. Those agencies must be prepared, however, to defend their expenditures, both to the legislative committees and to the public, in whose best interests we must assume they intended to act.

■■■■ In short, we cannot agree with Petitioners that the current use of the budget digest has the "force and effect of law" in violation of this Court's holding in *Common Cause*. 186 W.Va. at 538, 413 S.E.2d at 359, syl. pt. 2. Critically, a listing in the budget digest does not confer on the Legislature, on any legislator, or on any other citizen, the ability to require, as a matter of law, the expenditure of state funds for the narrower purpose set forth in the budget digest. Not only is the executive office, officer, or agency free to choose *not* to expend the money for the purpose stated in the budget digest, such entities are similarly free to expend the appropriation for another purpose within the scope of the appropriation, but distinct from the purpose set forth in the budget digest. This freedom negates Petitioners' contention that the budget digest has the "force and effect of law." *Id.*

■■■■ Although this Court previously considered and rejected in *Common Cause* the argument that the budget digest process

runs afoul of the separation of powers provision found in article V, section one of our constitution, Petitioners raise this issue again. 186 W.Va. at 540, 413 S.E.2d at 361. Petitioners rely on *State ex rel. Barker v. Manchin*, 167 W.Va. 155, 279 S.E.2d 622 (1981), in which we struck as unconstitutional provisions of our Administrative Procedures Act [27] that empowered a legislative rule-making review committee to veto rules and regulations validly promulgated by administrative agencies pursuant to delegation of the legislature's rule-making authority. *Id.* at 178, 279 S.E.2d at 636. Based on the fact that only the Legislature is granted the authority to legislate, we held in *Barker* that the Legislature could not delegate to a committee the power to void or to amend administrative rules and regulations. Only through the legislature, as a whole, could such rules and regulations be acted upon. *Id.* at 156, 279 S.E.2d at 624, syl. pt. 2. While the budget digest process, at a quick glance, might cause some individuals to conclude that a constitutionally-prohibited delegation of duties is occurring with the preparation of the digest by a small group of legislators, this contention is easily disproved. Whereas constitutional infirmity resulted in *Barker* from the unlawful delegation to a legislative committee of the Legislature's power as a body to legislate, in the case before us, there is no comparable wrongful delegation of legislative power. This is because the budget digest process does not alter the lawful enactment, which is the budget bill. *Common Cause*, 186 W.Va. at 540, 413 S.E.2d at 361. As discussed above, the budget digest is only the legislative expression of how funds should be spent and not a mandate to spend state funds in any way contrary to the enacted budget bill. Unlike the legislative committee in *Barker*, the conferees committee involved in the budget digest process has no power to render ineffective provisions of the budget bill enacted into law by the whole Legislature. Consequently, there is no proscribed delegation of legislative authority. Because the budget digest simply and expressly sets forth the judgment of the conferees committee on what the Legislature intended and because that judgment expressly lacks the force and

---

**27.** *See* W.Va.Code §§ 29A–1–1 to –7–4 (Repl.Vol.     1999).

effect of law, there is no violation of the principles of *Barker* as a result of adhering to the legislatively-created budget digest process.

Having rejected Petitioners' constitutional claims rooted in the violation of the Modern Budget Amendment and finding it unnecessary to discuss at length the related concerns rooted in the separation of powers provision,[28] we proceed to consider whether the budget digest is being prepared consistent with the dictates of West Virginia Code § 4–1–18 and this Court's holdings in *Common Cause*.

### C. Statutory Concerns

▆▆▆▆ Our upholding of the budget digest process in *Common Cause*[29] was expressly rooted in our determination that the "*Budget Digest* prepared by the Conferees Committee on the Budget does not have the force and effect of law." 186 W.Va. at 538, 413 S.E.2d at 359, syl. pt. 2, in part. Notwithstanding our upholding of the budget digest process, we expressed concern that the potential for abuses of power which underlie the process could result in a ruling by this Court finding the process unconstitutional.[30] Based on these concerns, we imposed the following limitations on the budget digest process in *Common Cause*, which we again emphasize:

The *Budget Digest* must be approved by the entire Conferees Committee on the Budget at a regular meeting scheduled in the normal course of business and open to the public.

In order that officers in the executive branch not be confused concerning the nature of the *Budget Digest*, the *Budget Digest* must be clearly marked with a notice that the document has been prepared by

the Conferees Committee on the Budget and that the *Budget Digest* does not have the force and effect of law.

In order for the *Budget Digest* to conform to the requirement of W.Va.Code, 4–1–18 [1969], which directs the Conferees Committee on the Budget to prepare a "digest or summary" of the budget, the finance committees, their chairmen, or the subcommittee chairmen must have memoranda of the negotiations, compromises and agreements or audio recordings of committee or subcommittee meetings where votes were taken or discussions had that substantiate the material which is organized and memorialized in the *Budget Digest*.

186 W.Va. at 538, 413 S.E.2d at 358, syl. pts. 3, 4, 5.

▆▆▆ In challenging the application of the budget digest statute in this case, Petitioners claim that the digest constitutes more than a "summary" of the budget bill, in violation of the statutory language. We suggest that a careful reading of West Virginia Code § 4–1–18 contemplates that the budget digest should be more than a mere "summary" of the budget bill. As a result of viewing the budget digest legislation in this limited fashion, Petitioners misunderstand the scope and purpose of West Virginia Code § 4–1–18. That statute requires the preparation of:

a digest or summary of the budget bill *containing detailed information similar to that included in the budget document submitted to the Legislature by the governor but including amendments of legislative committees, and as finally enacted by the Legislature.*

law," we refuted this contention stating "that the *Budget Digest* does not serve to alter or amend the enacted budget bill." 186 W.Va. at 540, 413 S.E.2d at 361 (citing *Hechler v. McCuskey*, 179 W.Va. 129, 365 S.E.2d 793 (1987)).

**30.** While we upheld the use of the budget digest in *Common Cause* as "preferable to available alternatives," we emphasized the need for utilizing "appropriate procedural protections" to permit the continued use of the digest. 186 W.Va. at 542, 413 S.E.2d at 363.

---

**28.** Because the funds which are the subject of the budget digest have already been appropriated through the enactment of the budget bill, no separate ratification by either the Legislature or the governor is required.

**29.** Petitioners' theory in *Common Cause* was that the process underlying the budget digest's preparation amounted to an improper delegation of the Legislature's budget-making authority to a few select and powerful legislators. Acknowledging that the case would be open and shut if the budget digest "had the force and effect of

W.Va.Code § 4–1–18 (emphasis supplied). The italicized language makes clear that the document to be prepared following the budget bill's passage is not a mere "summary," but rather a digest containing "detailed information" that represents the actions during the session of "legislative committees" prior to the enactment of the budget bill. Having examined the sample budget digest filed as an exhibit in this case, we cannot conclude that the form adopted by the budget conferees committee in that instance is outside the type of instrument contemplated and intended by West Virginia Code § 4–1–18.

Petitioners also assert that the requirements this Court imposed upon the Legislature through our decision in *Common Cause* are not being met. Specifically, Petitioners aver that the Legislature has failed to comply with the requirement that the budget digest should be supported by sufficient documents or audio recordings to memorialize the negotiations which result in statements of "Legislative Intent" included in the budget digest. Despite Petitioners' claim to this effect, the record submitted to this Court does not substantiate this averment. Accordingly, we have no basis from which to conclude that the Legislature is failing to comply with the directives of this Court regarding record making and keeping.

With regard to Petitioners' claim that the open meetings law has been violated in the process of preparing and publishing the budget digest, the record before us does not justify a finding in that regard.[31] We do caution that care should be taken to ensure that no such violations should occur in connection with the process of preparing the budget digest.

▆▆▆▆ We now address a serious concern. Petitioners claim that matters extraneous to the deliberations of the finance com-

mittees or sub-committees and the conferees committee have been included in the digest under the rubric of "Legislative Intent."[32] From the record in this case, we take notice of a practice that appears to go beyond the intent underlying West Virginia Code § 4–1–18. The practice to which we refer is the inclusion in the budget digest of items under the heading of "Legislative Intent" that were not the subject of consideration by the respective legislative committees or the conferees committee *during the legislative session and at least contemporaneous with* the final legislative enactment of the budget bill. Specifically, the record documents that *subsequent to the legislative enactment of the budget bill* legislators have been permitted to specify pet projects in their respective districts, ranked by preferences of one to ten, which might be included in the budget digest *despite the fact that the legislative committees or conferees committee* did not consider these specific requests *prior to the final legislative enactment of the budget bill.* West Virginia Code § 4–1–18 envisions the inclusion in the budget digest of "detailed information similar to that included in the budget *document* submitted to the Legislature by the governor but including amendments of legislative committees, *and as finally enacted by the Legislature."* W.Va.Code § 4–1–18 (emphasis supplied). Based on this statutory language, we hold that a fair reading of West Virginia Code § 4–1–18, contemplates and requires that the material contained in the budget digest under the heading "Legislative Intent" must have been the subject of discussion, debate, and decision prior to final legislative enactment of the budget bill, either within the legislative committees or sub-committees of the respective houses to which the budget bill, or parts of it, have been committed, formally or informally, or within the conferees committee.[33]

---

**31.** We acknowledge that the Legislature vehemently denies that any such violations have occurred.

**32.** *See supra* note 20.

**33.** We note that during oral argument of this matter, counsel appearing for a legislative officer indicated that some entries in the budget digest may have become so routine that no notation of

their discussion might be found in a particular year, such entries having been adopted simply as "understood"—a practice of carrying amounts over from prior budget years. Under our holding in this case and this Court's earlier decision in *Common Cause,* some notation or record, in print or audio format, should be made *during the current consideration of* the budget and before its final legislative enactment in order to fully com-

We understand that the actual budget digest will be prepared, with the help of staff, after the extreme pressures of the legislative session shall have passed. *See Common Cause*, 186 W.Va. at 543, 413 S.E.2d at 364. The continued approval of the budget digest process will be better assured if care is taken to record in one acceptable fashion or another, the discussion, debate, and decision which substantiates the inclusion of an item in the budget digest and that such discussion, debate, and decision occurred prior to the final enactment of the budget bill. *See Common Cause*, 186 W.Va. at 542, 413 S.E.2d at 363. Only through careful and deliberate record making can the use of the budget digest process continue to be viewed as both legitimate and lawful.[34]

In this Court's considered opinion, it would be prudent for the conferees committee to take care to both record and maintain documentation that demonstrates that the requirements set forth herein are being met. We are not unmindful of Petitioners' suggestion that the temptation for abuse of the digest process appears borne out by the fact that those in positions of particular responsibility and power in either house may be steering significant funding towards projects or interests that benefit their constituents through the budget digest. Notwithstanding the counter arguments that Respondents raise concerning the inherent nature of power within the legislative process, these indications of favoritism expressly validate the inquiries necessitated by the petition brought herein. Our holding today, requiring that the contents of the budget digest must have been the subject of discussion, debate, and decision prior to final legislative enactment of the budget bill, should be especially and faithfully observed with respect to budget digest expressions of legislative intent recommending expenditures in specific localities or for obviously local projects.[35]

Petitioners performed a valid and important service to this state through their vigilant efforts to investigate the practices related to the budget digest process. While the Legislature and the Executive appear to view the budget digest process as both a necessary and functional method of performing their respective duties relative to the budget, substantial care must be taken to adhere to the protections first announced in *Common Cause* upon which we expand today. Only through such adherence can the budget digest practice continue to be upheld.

### D. Transfer of Legislative Appropriations—"098 Account"

Petitioners challenge the practice, under recent budget bills, of authorizing a legislative officer to cause the transfer of legislative appropriations to the executive, particularly, the governor's civil contingent fund.[36] *See* W.Va.Code § 5–1–18. Under article VI, section 51 of the state constitution, the governor is required to include in his budget such sums of money as each house of the Legislature requires for its expenses, and may not reduce that sum. *See State ex rel. Brotherton v. Blankenship*, 158 W.Va. 390, 214 S.E.2d 467 (1975) (holding that under article V, section 1 of state constitution, governor may not reduce the amounts appropriated by Legislature for its internal operations). Upon appropriation through the final legislative enactment of the budget bill, the appropriations for the Legislature are exempt from the veto power of the Governor. *See id.*

Included in the classification of appropriations section of the general provisions title of

ply with our interpretation of West Virginia Code § 4–1–18 and the holdings of *Common Cause.*

**34.** We appreciate that matters may arise after enactment of the bill which invite or justify comment by responsible legislators. Such matters might include a gubernatorial veto or reduction of an account without subsequent legislative reconsideration of the executive action. While legislators, like all citizens, are free to make remarks on these illustrative matters, such com-

ments are not a part of the "budget digest," as prescribed by West Virginia Code § 4–1–18.

**35.** See W.Va. Const. art. 10, §§ 6, 6a.

**36.** Petitioners refer to this transfer mechanism as involving the "098 account." We note, however, that the accurate account reference is fund 0105, activity 098.

the budget bills enacted in 1998, 1999, and 2000[37] is the following proviso:

> *And provided further,* That upon written request of the speaker of the house of delegates, the auditor shall transfer within the general revenue fund amounts from the total appropriations of the house of delegates to other agencies, boards or departments. . . .

Pursuant to that purported authority, the speaker of the house requested, and the auditor did effect a transfer of $1,250,000 in 1998, and $600,000 in 1999, from the House of Delegates' appropriation to the governor's civil contingent fund. The funds which were the subject of these transfers were appropriated to the House of Delegates exclusively for the expenses of that body, under the special protections afforded legislative appropriations by the Constitution. We note that the transfers at issue here have been accomplished and the monies expended by the governor.

■■■■ This Court takes notice of the passage and approval by the governor[38] of Enrolled House Bill 2385, which took effect upon its passage on February 23, 2001, expressly disavowing the authority of the auditor to make such transfers in the future at the request of officers of either house of the Legislature, either by the action of an officer of such house or by any means other than a budget bill or supplementary appropriation. In light of the exercise by the Legislature and governor of their power to make and approve law in this regard, prohibiting such transfers, we consider the issue moot *until and unless such authority is again asserted.* Based on the passage of House Bill 2385, we determine that the practice of transferring funds from a legislative expense account to an executive department account by means other than a budget bill or supplementary appropriation requires no further action by this Court.

Based on the foregoing, we grant a moulded writ of mandamus which requires the Legislature to only include as part of the budget digest information that has been the subject of discussion, debate, and decision prior to final legislative enactment of the budget bill. Based on our decision to apply the holding herein on a prospective basis only, we deny Petitioners' request for an award of attorneys fees.[39] The Clerk of the Court is hereby directed to issue the mandate for this case forthwith.

Writ refused in part and granted as moulded.

Justice MAYNARD concurs and reserves the right to file a concurring opinion.

Chief Justice McGRAW dissents.

Justice STARCHER, deeming himself disqualified, did not participate in the decision of this case.

Judge PRATT, sitting by temporary assignment.

DAVIS, Justice, dissenting.

The Honorable Chief Justice Thomas B. Miller, in his dissent to *Common Cause of W.Va. v. Tomblin,* 186 W.Va. 537, 413 S.E.2d 358 (1991), eloquently predicted that the Court's decision therein to permit the Budget Digest to include additional expenditures not approved of by the entire Legislature during its Regular Session was, in fact, "a great deal of unreality and a future potential for much mischief." *Id.,* 186 W.Va. at 579, 413 S.E.2d at 400. Much to the chagrin of the citizens of this State, Chief Justice Miller's prophesy has become self-fulfilling. And, like the proverbial ostrich who sticks his head in the sand to avoid seeing the obvious, the majority of this Court has refused to recognize the blatantly unlawful nature of the present Budget Digest preparation practice by actually allowing one of the biggest legal fictions in West Virginia history to continue unchecked *ad infinitum.* Although I agree that a writ of mandamus should be issued in this case, I

---

**37.** 1998 W.Va. Acts ch. 6 at 47; 1999 W.Va. Acts ch. 7 at 37; 2000 W.Va. Acts ch. 10 at 68.

**38.** Governor Bob Wise approved the bill on March 5, 2001.

**39.** *See State ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia DEP,* 193 W.Va. 650, 458 S.E.2d 88 (1995) (discussing when attorney's fees may be awarded in mandamus actions).

do not concur with my colleagues as to the nature of the relief that should be awarded. Rather than the toothless writ they have deemed to be appropriate, I believe that the proper remedy is to require the Legislature, in its future preparation of the Budget Digest, to strictly abide by the clear directives contained in Article VI, section 51 of the West Virginia Constitution and W. Va.Code § 4–1–18 (1969) (Repl.Vol.1999). At present, however, the Legislature's actions could not be further from those prescribed by the above-referenced authorities.

In its announcement of today's decision, the majority has obfuscated the law which governs this proceeding by crafting new holdings which do not acknowledge the actual state of affairs underlying the instant controversy and by reaching an ultimate result that is completely at odds with its analysis. As an alternative to the convoluted reasoning relied upon by the majority of my brethren, I submit that the more straightforward and legally sound approach rests upon longstanding principles of established law.

*A. West Virginia Constitutional Law*

Pursuant to the Constitution of this State, the government of West Virginia is divided into three co-equal branches of government: "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time ...." W. Va. Const. art. V, § 1.[1] Integral to the separation of powers is the notion that each of the branches of government has its own constituent components and its own defined functions. *See, e.g.,* Syl. pt. 1, *State ex rel. Barker v. Manchin,* 167 W.Va. 155, 279 S.E.2d 622 (1981) ("Article V, section 1 of the Constitution of West Virginia which prohibits any one department of our state government from exercising the powers of the others, is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed."). *But cf. Chapman v. The Huntington, West Virginia, Hous. Auth.,* 121 W.Va. 319, 336, 3 S.E.2d 502, 510 (1939) ("The separation-of-power rule, as expressed in the West Virginia Constitution, however, is not adamant.... Necessarily, in order to make government workable and economical, it must lend itself to practical considerations. Thus, we find in practice the three departments of our government, both state and federal, are mutually dependent upon, and support, each other." (citations omitted)).

Of particular importance to the instant proceeding is the composition of the legislative branch. In this regard, the Constitution provides that "[t]he legislative power *shall* be vested in a senate *and* house of delegates." W. Va. Const. art. VI, § 1 (emphasis added). Thus, it is apparent that West Virginia's Legislature is bicameral in nature, meaning that an action of the Legislature contemplates action by both houses thereof. *See Lusher v. Scites,* 4 W.Va. 11, 13 (1870) ("The legislative power is an attribute of sovereignty, and the exercise of that attribute is vested by the people of the State in the Senate *and* House of Delegates." (emphasis added) (citation omitted)); *Boyers v. Crane,* 1 W.Va. 176, 180 (1865) ("[T]he legislative power is vested in the Senate *and* House of Delegates[.]" (emphasis added) (citation omitted)). Likewise, neither legislative chamber may act alone in a bicameral system.[2]

In addition to establishing our tripartite system of government and defining the com-

---

**1.** *See also* Robert M. Bastress, *The West Virginia State Constitution: A Reference Guide* 124 (1995) ("This section ... sets forth a fundamental principle of American government: that governmental powers must be allocated among the separate branches to ensure each has independent strength.").

**2.** This is so because

[t]he legislative powers of the state are ordinarily vested, under constitutional provisions, in a legislature composed of a senate and house of representatives or bodies equivalent thereto, although otherwise designated, elected by the people, the bodies being integral parts which, combined, are the legislative branch or agency of the state, and *it has been said that neither is an entity of government without the other. The legislature must act as a body, and, under the bicameral system, it is only where both bodies are lawfully assembled that they constitute the legislature.*

81A C.J.S. *States* § 40, at 372–73 (1977) (emphasis added) (footnotes omitted).

ponents of the legislative branch thereof, the Constitution also delineates specific duties for each of the government's separate branches. At issue in the petitioners' request for relief are the particular duties ascribed to the Legislature vis-a-vis the budgetary process. In section 51 of Article VI of the West Virginia Constitution, the procedure for proposing the budget bill, as well as any appropriations extraneous thereto, is set forth in great detail. Insofar as supplemental appropriations are concerned, this section directs that "[t]he legislature shall not appropriate any money out of the treasury except in accordance with provisions of this section," W. Va. Const. art. VI, § 51, and that "[e]very appropriation bill shall be either a budget bill, or a supplementary appropriation bill ...." *Id.* at subsec. A, para. 1. *Accord* Syl. pt. 10, *Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1989) (" 'Section 51, Article VI, West Virginia Constitution, commonly known as the "Budget Amendment", is couched in mandatory terms, and clearly embraces a mandate of the electorate of this State governing the Legislature in the appropriation of [public] funds.' Syl. Pt. 2, *State ex rel. Trent v. Sims*, 138 W.Va. 244, 77 S.E.2d 122 (1953).").[3]

Once it has been determined that supplementary appropriations are necessary, the Constitution provides further guidance for their consideration.

Neither house shall consider other appropriations until the budget bill has been finally acted upon by both houses, and no such other appropriations shall be valid except in accordance with the provisions following: (a) Every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated and called therein a supplementary appropriation bill; (b) each supplementary appropriation bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be laid and collected as shall be directed in the bill unless it appears from such budget that there is sufficient revenue available.

W. Va. Const. art. VI, § 51, subsec. C, para. 7.

An appropriations bill may be enacted into law only after it has been duly considered and approved by both legislative chambers and, thereafter, presented to the Governor for approval or disapproval.

*Every* budget bill or *supplementary appropriation bill passed by a majority of the members elected to each house of the legislature shall, before it becomes a law, be presented to the governor.* The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein. If he approves he shall sign it and thereupon it shall become a law. The bill, items or parts thereof, disapproved or reduced by the governor, shall be returned with his objections to each house of the legislature.

Each house shall enter the objections at large upon its journal and proceed to reconsider. If, after reconsideration, two thirds of the members elected to each house agree to pass the bill, or such items or parts thereof, as were disapproved or reduced, the bills, items or parts thereof, approved by two thirds of such members, shall become law, notwithstanding the objections of the governor. In all such cases, the vote of each house shall be determined by yeas and nays to be entered on the journal.

A bill, item or part thereof, which is not returned by the governor within five days (Sundays excepted) after the bill has been presented to him shall become a law in like manner as if he had signed the bill, unless the legislature, by adjournment, prevents such return, in which case it shall be filed in the office of the secretary of state, within five days after such adjournment, and shall become a law; or it shall be so filed within such five days with the objections of the governor, in which case it shall become law to the extent not disapproved by the governor.

*Id.* at subsec. D, para. 11 (emphasis added).

Given that the grant of authority to the Legislature generally encompasses all that is

---

**3.** *See also* W. Va. Const. art. X, § 3 ("No money shall be drawn from the treasury but in pursuance of an appropriation made by law, ... nor shall any money or fund be taken for any other purpose than that for which it has been or may be appropriated, or provided.").

not specifically prohibited by the Constitution,[4] it is apparent that the Legislature is empowered to appropriate money from this State's treasury as long as it complies with the procedures set forth in W. Va. Const. art. VI, § 51. *See* Robert M. Bastress, *The West Virginia State Constitution: A Reference Guide* 180 (1995) ("The first sentence of section 51 ... makes clear that the legislature must use the procedures in this section to appropriate any money from the treasury."). In fact, this Court has previously observed that "[t]he power to appropriate money is vested exclusively in the legislature." *State ex rel. West Virginia Bd. of Educ. v. Miller*, 153 W.Va. 414, 420, 168 S.E.2d 820, 824 (1969) (citing *Sims*, 138 W.Va. 244, 77 S.E.2d 122).[5]

When particular responsibilities have been ascribed to the Legislature, the focus then shifts to a determination of whether that particular function is a purely legislative duty. Such a distinction between pure legislative duties and discretionary tasks, which have been assigned to the Legislature, is important as the former are not delegable while the latter may be delegated for performance by another governmental entity. "Purely legislative power, which can never be delegated, has been described as the authority to make a complete law—complete as to the time when it shall take effect and as to whom it shall be applicable—and to determine the expediency of its enactment."

*State ex rel. West Virginia Hous. Dev. Fund v. Waterhouse*, 158 W.Va. 196, 211, 212 S.E.2d 724, 733 (1974) (internal quotations and citations omitted).[6] "[U]nder the separation of powers provision of the Constitution of this State, the power of enacting legislation is vested solely in the legislature," *State ex rel. Carson v. Wood*, 154 W.Va. 397, 401, 175 S.E.2d 482, 485 (1970), and, "as a general rule in this jurisdiction, the legislature cannot delegate its power to make law," *Waterhouse*, 158 W.Va. at 211, 212 S.E.2d at 733. *Accord State v. Grinstead*, 157 W.Va. 1001, 1013, 206 S.E.2d 912, 920 (1974) ("The authority to enact laws, being exclusively a legislative function, cannot be transferred or abdicated to others." (citation omitted)). Because the process of appropriating funds necessarily entails the enactment of such directives into law, the Legislature's appropriations authority is a purely legislative duty which is not delegable. *See generally* W. Va. Const. art. VI, § 51 (providing procedure whereby legislatively proposed appropriations are ultimately enacted into law).

### B. West Virginia Code § 4–1–18

Having laid the foundation of constitutional law upon which the proper determination of this cause should rest, it is equally important to consider the statute which is at the heart of the parties' controversy. W. Va.Code § 4–1–18 (1969) (Repl.Vol.1999) supplements the Legislature's constitutionally-ascribed

**4.** " 'The general powers of the legislature are almost plenary. It can legislate on every subject not interdicted by the constitution itself.' Point 2 Syllabus, *State Road Commission v. The County Court of Kanawha County*, 112 W.Va. 98[, 163 S.E. 815 (1932)]." Syl. pt. 8, *Farley v. Graney*, 146 W.Va. 22, 119 S.E.2d 833 (1960). *Accord* Syl. pt. 1, *Foster v. Cooper*, 155 W.Va. 619, 186 S.E.2d 837 (1972) ("The Constitution of West Virginia being a restriction of power rather than a grant thereof, the legislature has the authority to enact any measure not inhibited thereby."); *Lusher v. Scites*, 4 W.Va. 11, 13 (1870) ("[T]he only limitation on the power in the legislature, is to be sought for in the constitution[.]").

**5.** *See also Gribben v. Kirk*, 197 W.Va. 20, 24, 475 S.E.2d 20, 24 (1996) (per curiam) (observing that "the power to appropriate money from the treasury of this State is vested in the legislature subject to specific requirements for executive action by the Governor pursuant to *W. Va. Const. Art. VI, § 51*" (footnote omitted)); *State ex rel.*

*Brotherton v. Blankenship*, 157 W.Va. 100, 127, 207 S.E.2d 421, 437 (1973) (Neely, J., dissenting) (recognizing "the Legislature's absolute power over the appropriation of funds").

**6.** That is not to say, however, that the Legislature may not delegate nonlegislative duties to an administrative agency, which authority is outside the scope of this dissenting opinion. *See, e.g., State ex rel. West Virginia Hous. Dev. Fund v. Copenhaver*, 153 W.Va. 636, 649, 171 S.E.2d 545, 553 (1969) ("The legislature may delegate its nonlegislative functions and confer discretion in the administration of the law, but it may not delegate purely legislative powers in the absence of constitutional authorization." (internal quotations and citation omitted)). *See also* Syl. pt. 5, *Woodring v. Whyte*, 161 W.Va. 262, 242 S.E.2d 238 (1978) ("Before a delegation of legislative power to an administrative agency will be held to be unconstitutional as a violation of Article VI, Section I of the West Virginia Constitution, such delegation must be of purely legislative power.").

appropriations authority by requiring it to prepare an annual Budget Digest after its passage of the Budget Bill.

The Legislature, acting by its appropriate committees, shall consider the budget bill, the budget document and matters relating thereto, and following such consideration and upon the passage of the budget bill by the Legislature, the Legislature shall prepare *a digest or summary of the budget bill containing detailed information similar to that included in the budget document submitted to the Legislature by the governor but including amendments of legislative committees, and as finally enacted by the Legislature.* Such digest or summary shall be prepared at the direction of and approved by members of the conferees committee on the budget and shall be included in the journals of the Legislature or printed as a separate document, and copies shall be furnished to the governor, commissioner of finance and administration, and the various state spending units for such use as may be deemed proper.

W. Va.Code § 4–1–18 (emphasis added). Stated otherwise, this statute requires the Legislature, through its conferees committee on the budget, to prepare a synopsis of the Budget Bill as it was "finally enacted by the Legislature," § 4–1–18, which signifies passage thereof by "a majority of the members elected to each house," W. Va. Const. art. VI, § 51, subsec. D, para. 11.

The focus of the majority's inquiry, then, should have been to answer two simple questions arising from this statutory language. First, whether W. Va.Code § 4–1–18, which directs the preparation of a Budget Digest document, is constitutional. And second, whether the Legislature's present method of preparing the Budget Digest, wherein additional allocations are made which have not been *approved* by the entire Legislature or

by the Governor, complies with the mandates of this statute.

## C. Constitutionality of West Virginia Code § 4–1–18

To resolve the first query, I submit that W. Va.Code § 4–1–18 is constitutional on its face. When assessing the constitutionality of a legislative enactment, it is customary to attempt to uphold the statute and to ascribe to it an interpretation that complies with the constitutional law of this State.

"In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt." Point 1 Syllabus, *State ex rel. Appalachian Power Company v. Gainer,* 149 W.Va. 740[, 143 S.E.2d 351 (1965) ].

Syl. pt. 3, *State ex rel. West Virginia Hous. Dev. Fund v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969).[7] Upon reading the plain language of W. Va.Code § 4–1–18, no constitutional infirmities are apparent on the face of this statute.

The plain language of § 4–1–18 directs the Legislature, through its conferees committee on the budget, to prepare a "digest or summary of the budget bill containing detailed information" regarding the Legislature's

---

**7.** *See also* Syl. pt. 4, *Woodring v. Whyte,* 161 W.Va. 262, 242 S.E.2d 238 (" 'When the constitutionality of a statute is challenged, every reasonable construction must be resorted to by the courts to sustain its validity and any reasonable doubt must be resolved in favor of the constitutionality of the legislative act in question.' [Syllabus Point 2,] *State ex rel. Metz v. Bailey,* 152 W.Va. 53, 159 S.E.2d 673 (1968)."); *Coal & Coke*

*Ry. Co. v. Conley,* 67 W.Va. 129, 166, 67 S.E. 613, 629 (1910) ("The courts will never impute to the legislature intent to contravene the constitution if it can be avoided, and it can always be avoided, if there is no language in the statute, expressing intent to do so, and effect, consistent with the limitations of legislative power, can be given to the statute.").

amendments to the Budget Bill originally submitted to it by the Governor and reflecting the final version of the Budget Bill enacted by the Legislature. W. Va.Code § 4–1–18. Absent statutory definitions for the terms "digest" and "summary", the commonly-accepted usage of these words must be employed. *See, e.g., Syl. pt. 1, McCoy v. VanKirk,* 201 W.Va. 718, 500 S.E.2d 534 (1997) (" 'In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used.' Syllabus Point 1, *Miners in General Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds [by] Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 291 S.E.2d 477 (1982).").

In common parlance, the term "digest" signifies "a summation or condensation of a body of information." Webster's Ninth New Collegiate Dictionary 354 (1983). *Accord* Random House Webster's Unabridged Dictionary 553 (2d ed.1998) (construing "digest" as "a collection or compendium, usually of … legal … matter, esp. when classified or condensed"). Similarly, "summary" is commonly defined as "an abstract, abridgment, or compendium." Webster's Ninth New Collegiate Dictionary, at 1181. *Accord* Random House Webster's Unabridged Dictionary, at 1904 (indicating that "summary" denotes "a comprehensive and usually brief abstract, recapitulation, or compendium of previously stated facts or statements"). Therefore, W. Va.Code § 4–1–18 commands the Legislature to prepare a synopsis of the Budget Bill submitted to the Governor for approval or disapproval, with notations as to the Legislature's changes to the Governor's original Budget Bill.

It has further been determined that the purpose of such a document is to provide insight as to the legislative intent inherent in the Budget Bill but which may not be readily apparent therefrom. *Common Cause,* 186 W.Va. at 540, 413 S.E.2d at 361 (commenting that this Court has "looked to the *Budget Digest* to help us ascertain the intent of the legislature in making specific appropriations"

(citation omitted)); *Hechler v. McCuskey,* 179 W.Va. 129, 133, 365 S.E.2d 793, 797 (1987) (recognizing that "[t]he Legislature uses this Digest as its detailed explanation concerning the manner in which appropriations are to be expended"); *Jones v. Rockefeller,* 172 W.Va. 30, 34 n. 4, 303 S.E.2d 668, 672 n. 4 (1983) (observing that legislative intent as to contemplated expenditure of budgetary appropriations may be gleaned from the Budget Digest). In fact, the Digest, itself, announces that it "is prepared to provide detail regarding the intent of the Legislature in enacting certain appropriations." Legislature of West Virginia, *Digest of the Enrolled Budget Bill* 1 (Fiscal Year 1999–2000). "Thus, the plain language of this statute reflects that the Digest is designed to do two things: first, summarize the budget bill as passed; and, second, reflect the legislative changes made to the budget as submitted by the governor." *Common Cause,* 186 W.Va. at 582–83, 413 S.E.2d at 403–04 (Miller, C.J., dissenting). Both of these purposes clearly fall within the scope of authority granted to the Legislature to enact laws to carry out its constitutionally-prescribed budgetary functions. W. Va. Const. art. VI, § 51, subsec. D, para. 12 ("The legislature may, from time to time, enact such laws, not inconsistent with this section [concerning the budget and supplementary appropriation bills], as may be necessary and proper to carry out its provisions."). Therefore, it would appear that W. Va.Code § 4–1–18 is constitutional *on its face.*

### D. Propriety of Present Application of West Virginia Code § 4–1–18

In answering the second question raised by the petitioners, *i.e.,* whether the Legislature's present method of preparing the Budget Digest, wherein additional allocations are made which have not been *approved* by the entire Legislature or by the Governor, complies with the mandates of this statute, I disagree with the decision reached by my colleagues. Instead of blindly looking the other way while this State's precious financial resources are being diverted in contravention of the clear constitutional and statutory guidelines for appropriations, I recognize that the present state of affairs neither complies with the

mandates of W. Va.Code § 4–1–18 nor comports with the overriding constitutional tenets governing such a budgetary procedure. Simply stated,

> [i]t is no objection to the remedy in such case, that the statute, the application of which in the particular case is sought to be prevented, is not void on its face, but is complained of only because its operation in the particular instance works a violation of a constitutional right.

Syl. pt. 8, *Coal & Coke Ry. Co. v. Conley,* 67 W.Va. 129, 67 S.E. 613 (1910).[8] From the memoranda of law submitted for this Court's consideration and the appended information, it appears to me that the conferees committee, in the course of declaring the Legislature's intent in the Budget Digest, is actually making additional allocations of state monies that have not been submitted for approval as required by the Constitution rather than preparing a mere "digest or summary" of the Budget Bill. *See* W. Va.Code § 4–1–18 (defining contents of Budget Digest). As such, the Budget Digest does not provide an accurate and succinct version of the Budget Bill "finally enacted by the Legislature." *Id.* The difficulties attending the Legislature's current Budget Digest compilation practice are numerous and violative of multiple fundamental principles.

First, despite the respondents' protestations to the contrary, it seems that the unauthorized allocations contained in the Budget Digest, although not formally denominated as "appropriations," nevertheless have the force and effect thereof without the benefit of the constitutional protections normally attending such disbursements. *See generally* W. Va. Const. art. VI, § 51. When viewing legislative actions, the substance of the act complained of, instead of its simple form, directs the ensuing analysis. *See, e.g., Common*

*Cause,* 186 W.Va. at 540, 413 S.E.2d at 361 (commenting that, "[i]n deciding this case, it must be reality, not theory, that is the interpretive principle"); *Chapman,* 121 W.Va. at 350, 3 S.E.2d at 517 (Hatcher, J., dissenting) ("The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority." (internal quotations and citations omitted)). Appropriations generally are considered to be directives to spending units as to how certain monies have been allocated for use during the ensuing fiscal year. *See McGraw v. Hansbarger,* 171 W.Va. 758, 768, 301 S.E.2d 848, 858 (1983) ("The budgetary appropriation process provides the means by which ... dedicated revenue ... may be withdrawn from ... the treasury and applied to the purpose for which it was intended.").[9] Under the circumstances presented in this proceeding, I am firmly convinced that the expenditures at issue herein have the full force and effect of appropriations. The unauthorized allocations contained in the Budget Digest effectively direct various entities as to how the Legislature contemplates their spending of allotted monies and actually serve as the authorizations needed to withdraw these funds from the State's treasury.

Additionally, the appropriations presently contained in the Budget Digest have not satisfied the constitutional safeguards for the proposal, passage, and presentment of such disbursements. *See generally State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 112, 207 S.E.2d 421, 429 (1973) ("The journey taken by a Budget Bill, from its formulation to its enactment into law, well demonstrates the great detail in which it is considered. It is thoroughly studied and considered four

---

**8.** *See also* Syl. pt. 12, *Farley v. Graney,* 146 W.Va. 22, 119 S.E.2d 833 ("An act of the legislature may be valid in its general scope and broad outline but invalid to the extent that the restrictions imposed thereby are clearly arbitrary and unreasonable in their application to specific property."); *Harbert v. Harrison County Court,* 129 W.Va. 54, 69, 39 S.E.2d 177, 188 (1946) ("A statute, however, may be unconstitutional and void in its application to a part of its subject matter and valid as to the remainder. It may be

constitutional in operation with respect to one state of facts and unconstitutional as to another." (citation omitted)).

**9.** *See also* W. Va.Code § 18–9B–2 (1967) (Repl. Vol.1999) (defining "appropriation", in education context, as "an item, or the amount of an item, budgeted by a county board of education for expenditure during the fiscal year").

times—twice by the Governor and twice by the Legislature (if it acts upon the Governor's veto).").  Section 51 of Article VI of the West Virginia Constitution provides specific guidelines for the proper exercise of the Legislature's appropriations authority.  First, the proposed appropriation must be approved by "a majority of the members elected to each house of the legislature." W. Va. Const. art. VI, § 51, subsec. D, para. 11.  If the appropriations contained in the Budget Digest are both proposed and approved by the conferees committee before their inclusion in the final Digest, the majority of legislators have not been afforded their opportunity to approve the proposed appropriations as required by the West Virginia Constitution.  Moreover, following passage by the Legislature, the appropriations must then be presented to the Governor for approval or disapproval. *Id. See also* W. Va. Const. art. VII, § 15 (reinforcing requirement that "[a] bill passed by the legislature making appropriations of money must be submitted to the governor for his approval or disapproval").  Again, though, if the present procedure is followed, the Governor is deprived of the right to review the proffered appropriations.  In short, the incorporation of unapproved appropriations into the Budget Digest completely ignores these procedural safeguards; disregards the constitutional procedures for the enactment of an appropriations bill; and abrogates the plainly stated requirement that the Digest serve as a synopsis of the Budget Bill finally enacted by the Legislature. *See* W. Va.Code § 4-1-18.

Finally, as I noted above, the Legislature has the sole authority to appropriate funds. *See, e.g., Miller*, 153 W.Va. at 420, 168 S.E.2d at 824.  Because such a function has been denominated a purely legislative function, the Legislature is required to exercise this authority itself, and it may not delegate its appropriations authority to any other entity.  In other words, our bicameral system requires the *entire* Legislature to participate in the approval of proposed appropriations.[10]  Just as the Legislature could not delegate its appropriations authority for performance by any other entity, it similarly cannot delegate

this power to a subcommittee of itself, or to one of its individual members, because such a committee is not comprised of the entirety of both of the legislative chambers.  "Unilateral action by any single participant in the lawmaking process is precisely what the Bicameralism and Presentment Clauses were designed to prevent." *City of New York v. Clinton*, 985 F.Supp. 168, 179 (D.D.C.) (mem.), *aff'd*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998).  Thus, the Legislature's authority to make appropriations is a purely legislative duty which is not delegable.  Furthermore, because the Legislature cannot delegate its appropriations authority, the Legislature's conferees committee on the budget should not be permitted to make appropriations through the Budget Digest, prepared pursuant to W. Va.Code § 4-1-18.

In spite of the Legislature's blatant variance from the governing constitutional and statutory law, it has nonetheless managed to pull the wool over the eyes of the majority and successfully left my colleagues with the impression that nothing is amiss in the wonderful world of the Budget Digest.  Not only does the Court's adoption of Syllabus point 2 completely ignore the present Budget Digest preparation process, including the addition of unapproved allocations of State funds, but its further acquiescence to Syllabus point 6 perpetuates this myth, and indeed compounds this abomination.

If Syllabus point 2 existed in a vacuum, far removed from any potential for mischief, it would paint an accurate picture of the ideal application of W. Va.Code § 4-1-18.  However, the reality is that "[t]he inclusion of an item in the budget digest in reference to a more generalized line item found in the budget bill *does* ... operate to appropriate money from the state treasury[.]" (Emphasis added).  Simply stated, just because the Budget Digest allocations walk like appropriations and talk like appropriations does not mean that they are not, in fact, appropriations regardless of the nomenclature used to describe them.  Additionally, despite the majority's holding to the contrary, I firmly believe that "[a]ll funds that are described in the budget digest [*do not* ] reference a specif-

---

10.  *See supra* note 2 and accompanying text.

ic line item in the budget bill." (Emphasis added). If there were such a neat matching of these various monetary figures and budgetary documents, the present controversy would not exist and certainly would not have been presented to us not once, but twice, for final resolution. *See generally Common Cause*, 186 W.Va. 537, 413 S.E.2d 358.

Moreover, Syllabus point 6 further confuses the applicable law by holding that

> [a] fair reading of West Virginia Code § 4-1-18 (1969) (Repl.Vol.1999), contemplates and requires that the material contained in the budget digest under the heading "Legislative Intent" must have been the subject of discussion, debate, and *decision* prior to final legislative enactment of the budget bill, either within the legislative committees or subcommittees of the respective houses to which the budget bill, or parts of it, have been committed, formally or informally, or within the conferees committee.

(Emphasis added). Rather than requiring the informative "legislative intent" to have been generated by way of *approval* by the Legislature during its deliberation of budgetary matters, the majority states simply that the matter need only have been *decided* by some committee thereof. This procedure is entirely inconsistent with the second Syllabus point of the Court's decision. In short, Syllabus point 6 allows the Legislature to continue its illegal delegation of its *nondelegable* budgetary powers to a subpart of itself. Additionally, Syllabus point 6 directly contradicts the staunch holding of Syllabus point 2 by requiring not the *approval* of a budgetary line item, as contemplated by Syllabus point 2, but merely the *decision* thereof, which, in the absence of more specific language, could amount to a total rejection of the proposed expenditure. I cannot countenance the further conflagration of the law of this State in this regard.

### E. Propriety of Mandamus Relief

Based upon the Legislature's continued perpetuation of the "mischief" foretold by Chief Justice Miller, I believe that the petitioners are entitled to the writ of mandamus that they seek. However, I do not find their entitlement to this relief to be based solely upon this Court's desired outcome of the case, but rather upon the petitioners' legally sound arguments and their correct interpretation of the governing law. On this point, my colleagues and I also disagree as is evidenced by the numerous patronizing admonishments that the petitioners have misunderstood this point of law or misapplied that legal principle. From my reading of the majority's unrelenting chastisement of the petitioners, I am amazed that they were granted a writ of mandamus at all. I should hope that in future opinions issued by this Court, the analysis of the parties' arguments and the final relief awarded would be more harmonious than is apparent in the case *sub judice*.

### F. Activity Code 098

Lastly, I wish to reiterate my earlier stated objections to this Court's decision to hold this case over for the purpose of addressing the now-mooted issue of activity code 098 of the Governor's civil contingent fund:

> [I] deem[ ] it unnecessary to consider the parties' arguments regarding the "098 account" in rendering a decision in this case on the primary issue which was submitted to the Court on October 3, 2000, *i.e.,* whether the Legislature's present application of *W. Va.Code*, 4-1-18 (1969) (Repl. Vol.1999) in its preparation of the annual Budget Digest is constitutional. [I] further believe[ ] that the resolution of the constitutionality issue would finally determine the extent of the Legislature's ability to delegate its authority and to make appropriations, thus rendering it unnecessary to join the Office of Governor as a party respondent to this proceeding.

*State ex rel. The League of Women Voters of West Virginia v. Tomblin,* No. 27905 (W.Va. Dec. 12, 2000). As a result of this Court's ill-advised delay in deciding this matter, which delay was occasioned by the re-briefing and re-submittal of this cause on an issue that was irrelevant and immaterial to the original question presented for this Court's resolution, the Legislature is now left with an inordinately short amount of time within which to cure the defects of its present Budget Digest preparation procedure before the

conclusion of its Regular Session. I only hope that it is the quality of the remaining Session time and not its quantity that will be of use to the Legislature.

### G. Conclusion

In his conclusory remarks to his *Common Cause* dissent, Chief Justice Miller said,

What the majority has done is distort the constitutional and legislative framework surrounding the budget and ignore our cases that preclude amending legislation without the full vote of the legislature.

186 W.Va. at 583, 413 S.E.2d at 404. I echo these sage words and would add only that in this case, the majority has gone a precipitous step further by also ignoring the constitutional protections adopted to safeguard the citizens of this State. Accordingly, I respectfully dissent.